(C. D. 1173)

A. De Cardi, Inc. *v.* United States

United States Customs Court, First Division

(Decided May 17, 1949)

*Vincente M. Ydrach* for the plaintiff.

*David N. Edelstein*, Assistant Attorney General (*Paul P. Rao*, Assistant Attorney General,[1] and *Richard E. FitzGibbon*, special attorney), for the defendant.

Before Oliver, Cole, and Mollison, Judges

Mollison, Judge: On May 18, 1943, the plaintiff in this case imported into the port of San Juan, Puerto Rico, 500 cases of wax

---

[1] Paul P. Rao, Assistant Attorney General in Charge of Customs at time of trial of case subsequently resigned on the 1st day of July 1948 and thereafter became a judge of the United States Customs Court.

matches. The matches were discharged from the importing vessel onto the pier, where they lay until May 25, 1943, when the importer was advised by the customs authorities that because of their inflammable nature the matches could not be permitted to remain on the pier nor could they be brought into the customhouse for inspection or examination as provided by law. The importer thereupon caused entry of the matches for consumption to be made and, upon payment of the estimated duties, was issued a delivery permit for the same.

The notation on the delivery permit and upon the summary of examination and appraisement with respect to the packages to be examined and the place of examination specified that five cases were to be examined at the importer's premises, Isabel Segunda Street No. 28, La Marina, San Juan. No specific case numbers were designated for examination, although it appears that the cases were marked from 1 to 500.

The delivery permit was duly presented to the customs officer at the pier and surrendered in exchange for the 500 cases of matches, which were then transported by a private, unbonded truck to the plaintiff's warehouse. As the merchandise had not been examined for the purposes of appraisement, as required by law, a redelivery bond, containing in addition to the usual conditions, the following added conditions, was given by the importer:

Whereas, the Principal named in the said bond has requested that the merchandise covered by Entry No. — dated May 25, 1943 in connection with which the above bond was given, be examined elsewhere that [sic] at the public stores, wharf, or other place in charge of the customs officer, in accordance with article 770, customs regulations of 1937, the obligors named in the above bond stipulate and agree that *the said merchandise shall be held at the place to which it will be removed for examination, until such merchandise shall have been released from customs custody by the completion of final examination for purpose of appraisement*; that, if the merchandise has been corded and sealed, the cords and seals shall be kept intact until removed by customs officers; that the merchandise shall be transferred, at any time before such release to such place as the collector of customs may direct; and that after such release it shall be redelivered to customs custody if demanded [sic] for redelivery is made by the collector in accordance with the law and regulations or in the event of failure to comply with any or all of the conditions contained in this stipulation, there shall be paid to the collector of customs an amount equal to. the value of the merchandise as set forth in the entry plus the estimated duty thereon. [Italics added.]

The matches remained in the front part of the establishment of the importer from May 25, 1943, until a date in June 1943, about which there is some conflict in the evidence. It appears that shortly after the arrival of the matches the importer determined that they were not of the kind or quality he believed he had ordered. He therefore sought to have them exported with benefit of drawback under the provisions of section 313 (c) of the Tariff Act of 1930 (19 U. S. C.

1940 ed. § 1313 (c)) as not conforming to sample or specification, and notified the customs authorities of his intention.

The importer filed an application on customs Form 7537 to effectuate this purpose on June 18, 1943. An employee of the customs was detailed to proceed to the importer's establishment with a customs padlock. He testified that the merchandise was placed in a compartment, having only one door, in the importer's premises, and that he placed the customs padlock on the door. Upon being asked when he did this, he first answered "Sometime in June; I don't remember," but upon being shown an unidentified paper he stated it was June 25. However, it is clear that he must have been in error in this latter testimony, for it appears that when the customs examiner came on June 19, 1943, to make his examination of the merchandise for the purposes of appraisement under the consumption entry, the customs padlock was already on the door and it was necessary to send to the customhouse for the key.

The importer's application to be permitted to export the merchandise with benefit of drawback on the ground that it did not conform to sample or specifications was denied August 6, 1943, whereupon application was made for reconsideration, which was had and the application again denied on October 19, 1943. The importer then made application to the Bureau of Customs, which on December 3, 1943, upheld the view of the collector.

During all of this time the merchandise remained in the customs padlocked compartment on the importer's premises, and on December 18, 1943, it was removed therefrom under customs supervision, and transported under bond to the port of Ponce, Puerto Rico, from whence it was exported to Fort de France, Martinique.

Appraisement took place on January 28, 1947, and the entry was liquidated on March 28, 1947. In this action the plaintiff seeks refund of the duties paid on the original entry under the provisions of section 557 (a) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C. 1940 ed. § 1557 (a)), reading, so far as pertinent, as follows:

* * * Merchandise upon which the duties have been paid and which shall have remained continuously in bonded warehouse or otherwise in the custody and under the control of customs officers, may be entered or withdrawn at any time within three years after the date of importation for exportation or for transportation and exportation to a foreign country. * * * under such regulations as the Secretary of the Treasury shall prescribe, and upon such entry or withdrawal, and exportation or shipment, the duties thereon shall be refunded.

The plaintiff contends that the taking of the matches from the pier to the importer's place of business on May 25, 1943, and their storage on his premises prior to examination for purposes of appraisement did

not constitute a release from customs custody for the reasons that (1) the acquisition of the matches from the pier by the importer was not of volition on his part but caused by the Customs Regulations, section 14.2 (a) of the 1943 issue of which requires that—

&ast; &ast; &ast; Matches and other inflammable, explosive, or dangerous articles shall be examined at the importer's premises or other suitable place, but not at the public stores;

(2) the collector failed to designate which of the 500 cases of matches should be reserved for examination for the purpose of appraisement, and hence all 500 were required to be reserved for that purpose; and (3) the merchandise was physically in customs custody and control from a time prior to examination for appraisement purposes until it was exported.

The defendant, on the other hand, contends that the merchandise was released from customs custody on May 25, 1943, when the delivery permit was surrendered and physical possession of the merchandise was taken by the importer.

We are of the opinion that on the facts and law applicable to this case, judgment must be given in favor of the plaintiff.

The character of the transaction involving the acquisition of the matches by the importer cannot be determined from the single fact of the surrender of the delivery permit to the customs officer at the pier and the taking of the matches into the physical possession of the importer. It must be considered in the light of the preceding and succeeding events and the intent of both parties. See *Fenton Co. et al.* v. *United States*, 14 Ct. Cust. Appls. 277, T. D. 41885; *United States* v. *W. F. Mackay*, 34 C. C. P. A. 127, C. A. D. 355; and *China Trading Co.* v. *United States*, 69 Treas. Dec. 890, T. D. 48322, as examples of this principle.

The merchandise in question was required by the customs laws and regulations to be examined for the purpose of appraisement. Section 499 of the Tariff Act of 1930, as amended by sections 15 and 16 of the Customs Administrative Act of 1938 (19 U. S. C. 1940 ed. § 1499), provides as follows:

Imported merchandise, required by law or regulations made in pursuance thereof to be inspected, examined, or appraised, shall not be delivered from customs custody, except under such bond or other security as may be prescribed by the Secretary of the Treasury to assure compliance with all applicable laws, regulations, and instructions which the Secretary of the Treasury or the Customs Service is authorized to enforce until it has been inspected, examined, or appraised and is reported by the appraiser to have been truly and correctly invoiced and found to comply with the requirements of the laws of the United States.

It is noteworthy that the statute quoted above speaks of "delivery" of imported merchandise from customs custody—not "release" from customs custody. One may deliver actual physical possession of a thing and yet retain such dominion over it, or over the person by

whom delivery is taken, as to amount to constructive custody of the thing. "Release," on the other hand, implies an unrestricted severance of dominion over the thing. We are of the opinion that it is this distinction which is vital in the case at bar.

Because of the inflammable nature of the matches at bar, they were subject to the provisions of section 14.2 (a) of the Customs Regulations of 1943, requiring that—

* * * Matches and other inflammable, explosive, or dangerous articles *shall* be examined at the importer's premises or other suitable place, but not at the public stores. [Italics added.]

The record shows that the foregoing regulation or its substance was conveyed to the importer by those in charge at the customs entry office. The importer's position then was that he could not secure unrestricted release of his merchandise until the same had been examined for purposes of appraisement, yet the examination could not be had on customs premises. While the regulation does not limit the place of examination to the importer's premises, it names that place primarily, and, of course, the logic and purpose of the regulation are quite obvious, that the risks to property possibly caused by the inflammable nature of matches should be borne by the importer thereof.

We do not think, however, that the law or the customs regulations contemplate that compliance with the requirements of section 14.2 (a) shall operate to deprive the importer of such other rights or privileges as are granted to him by other provisions of the law, which he would enjoy but for compliance with section 14.2 (a). Indeed, an examination of the regulations themselves is sufficient to rebut that thought. In section 14.2 (c), the following provision is made:

(c) Before permitting the removal of merchandise for examination elsewhere than at the public stores, wharf, or other place in charge of a customs officer, the collector shall require the importer to execute a bond on customs Form 7551, 7553, or other appropriate form, containing a condition for the return of the merchandise if demand for return is made after its release from customs custody upon the completion of final examination for purposes of appraisement. *The bond shall contain added conditions that the importer shall hold the merchandise at the place to which it has been removed for examination until it has been released from customs custody * * *.* [Italics added.]

Such a bond was taken by the collector in this case, and it contained the added condition, among others, that—

* * * the said merchandise shall be held at the place to which it will be removed for examination, until such merchandise shall have been released from customs custody by the completion of final examination for purpose of appraisement.

We observe that the conditions of the bond are such, and it was taken in such amount, as to effectively protect the revenue, and it can scarcely be doubted that the disabilities imposed by the bond upon the importer left ultimate dominion over the matches in ques-

tion in the hands of the customs authorities, leaving nothing but bare physical possession under what amounts to an agency in the hands of the importer. It seems to us that although the merchandise was not in the physical custody of customs, it was in the constructive custody thereof, and held just as effectively as if a customs guard were posted over it.

In section 22.32 (e) of the same regulations, the following appears:

(e) Except as stated in paragraph (c) of this section [note: Not here involved], merchandise examined elsewhere than at the public stores in accordance with the provisions of section 14.2 of these regulations *shall be considered released from customs custody when final examination for purposes of appraisement has been completed.* [Italics added.]

A plain reading of the regulations quoted above, as well as those hereinbefore quoted from section 14.2 (c), shows that in the consideration of the Treasury Department merchandise removed by the importer to a place other than public stores, wharf, or other places in charge of a customs officer for the purposes of examination is considered to be in customs custody until final examination for purposes of appraisement has been completed.

This comports with the intent of both of the parties to the transaction here in question. On the part of the customs officers who notified the importer that the merchandise would have to be removed from the pier and could not be examined on customs property, and who accepted the delivery permit, it must be presumed that they had only the enforcement of the foregoing regulations in mind; that is to say, they did not intend to release the merchandise from customs custody until the same had been examined for purposes of appraisement. It is clear from the record that the importer did not intend or desire a release of the merchandise from customs custody; he was attempting to comply with the customs regulations and the notification he had received from the entry office. Since neither on the part of the customs authorities nor on the part of the importer was a release of the merchandise from customs custody intended, it is clear that none was effectuated.

Viewed in the light of its surrounding circumstances, the action of the importer in this case was as much or more for the benefit of the Government as for the importer, and he obviously should not be penalized for it.

There is no question here that the bond given by the importer applied to all of the imported cases of matches and not merely to those designated for examination. As a matter of fact, as hereinbefore pointed out, the collector did not designate any of the cases involved by number, but merely specified that five cases were to be examined at the importer's premises. Under these circumstances, no one could know which were the examination cases until the arrival of the examining officer.

For the reasons hereinabove mentioned, we hold that the matches involved were, from the time of delivery to the importer's representative upon surrender of the delivery permit until the placing of the same under customs padlock prior to examination for the purposes of appraisement, constructively in customs custody. The record is clear that before such constructive custody would normally have ceased, i. e., upon the completion of examination for purposes of appraisement, the merchandise was returned to actual customs custody. We are satisfied that the requirements of the statute, section 557 (a), *supra*, granting refund of duties upon merchandise exported from continuous customs custody, were met in this case, and the protest claim is therefore sustained.

Judgment will issue accordingly.